May it please the Court. This case has far-reaching implications for prison medical officials regarding their abilities to use professional and medical judgment when providing medical care to incarcerated individuals. In denying qualified immunity, the District Court allowed for a new and concerning standard for the Eighth Amendment, that an inmate is entitled to receive whatever form of medical treatment he desires, regardless of whether medical professionals find that treatment medically necessary. Appellants asked the Court, excuse me, this Court to reverse and render judgment in favor of appellants because the District Court erred in the following three ways. First, it improperly defined clearly established law for qualified immunity purposes at the highest level of generality, ignoring this Circuit's mandate and Supreme Court mandate that it be specified with particularity and granularity. Second, the District Court improperly inferred that DeShields and Linthicum, as respective executives of their institutions, were liable solely based on a single employee's statement. And finally, the District Court erred as a matter of law by finding that whether or not there was a categorical ban on spinal cord stimulator replacement surgery was a material factual dispute. So let me ask you about that last one first, because as I understand, opposing counsel is saying we don't have jurisdiction in this appeal because of a material factual dispute, right? And we obviously can't consider whether there's a genuine factual dispute, is that right? That's correct, Your Honor. I'd like you to address that. I'm having trouble understanding what the factual dispute actually is that would deprive us of jurisdiction in this case. Yes, Your Honor. So on this type of interlocutory appeal, the court, as you said, cannot consider the genuineness of disputes, but can consider the materiality. And that is our argument here, is that the District Court found that there was a material factual dispute as to whether or not there was a categorical ban on this specific type of surgery, of treatment. And our argument is that is immaterial, whether there was a categorical ban or whether there was not. Okay. So why is it immaterial, then? In other words, the fact issue would be this prison system categorically bans, what is the device called? Spinal cord stimulator. Okay, SCS. All right. Categorically bans those. We're not going to use those. We're not going to treat those. We're not going to... We have to assume that there's a factual dispute as to that, right? But you're saying it's not material. That's correct. Okay. So why is it immaterial? So in the first situation, assuming that there was no categorical ban, which is appellant's contention, as there is no evidence in the record to suggest it. But assuming that's the situation, then this case comes down to a disagreement in medical treatment and Dr. Talley using her medical judgment to make the decision as to whether or not that surgery was medically necessary. Mr. Smith believes that that was the proper treatment for him, but it was only his subjective belief. That shows a disagreement in medical treatment. Now if we go to... It was recommended. Wasn't it recommended by doctors or the VA or something like that? The SCS? Before he was incarcerated, the VA did say that they may have been willing to replace it before his incarceration. So going to the second scenario, assuming that there was a categorical ban, Mr. Smith has not met his burden in showing that it was clearly established that an inmate had a right to his specific form of treatment, notwithstanding the fact that he's already been treated in other ways, that other treatment is available and being utilized. What does the record reflect? What treatment has he received according to the record? Yes, Your Honor. The record has several hundred pages of medical records through the course of about two or three years, and it shows that he was treated with a conservative pain management regimen, and that included work restrictions, so he would have passes where he didn't have to go to work. He had a bottom bunk restriction. He was treated with several different oral medications. They started, you know, off with ibuprofen and the over-the-counter medications, and then slowly worked up to different medications such as tramadol, non-formulary medications. Okay, so it's not just ibuprofen, right? Correct. That is correct. And then we get into this situation where, all right, someone's saying you need a spinal cord stimulator fixed, here's some aspirin, right? That looks really bad. That's correct, Your Honor. The record shows that every single time Mr. Smith had a complaint about pain, whether it was that the medication wasn't working or whether there were side effects that were making him sick, the prison officials took note of that, and they reacted accordingly. They responded to all of his complaints. I would also note, Your Honors, that this type of condition that Mr. Smith had, it's called loin pain hematuria syndrome. This is a very rare disorder, I guess you could call it, where it's basically just complaints of idiopathic pain, meaning there's no physiological basis for the pain, at least that doctors can really find, and the pain is constantly changing, and the treatments for the pain can be variable. Sometimes it goes away on its own. But what's key here is that this condition was not a malignant tumor that needed to be excised. It was not a disease that there was a cure for that prison officials were withholding. This is a very rare condition where the pain is very subjective and variable, and the record is clear that there is not one treatment over another that is required for this type of disorder. Is there anything in the record reflecting the capacity of TDCJ to use the SCS or repair the SCS, or is it a specialty kind of that requires, I don't know, is there, about the capacity of treating with this device? I would say, Your Honor, the record, that was not a factor. Feasibility was not a factor. It was simply, this is not required, this is not medically necessary to treat the complaints of pain that you have. Doesn't the director at some point say, look, we don't do this, and even says no batteries, you know, that disavows any responsibility for maintaining. Isn't that also in the record, though? Yes, that is. It's a policy. That is true, but there's no evidence that that is a policy. It's simply her statement, and the district court erred in inferring that that meant that there was this categorical policy. We have to, as I understood, we have to assume that categorically they don't use SCS, or they don't repair SCS, because otherwise we would be getting into whether there's a genuine factual dispute, right? Yes, Your Honor, that's going back to our... Correct. Could you, as I understand the other side's argument, they point to our De Lauder decision. I was on that panel. I didn't write the decision, but it was a 2018 case. I assume what they're, I think what they're saying is that's clearly established law for purposes of this case. What is your response to that? Yes, Your Honor. I would say first, there's two issues of citing De Lauder, and the first one is that the facts are not at all, cannot at all be analogized to the facts here. So in De Lauder, everyone agreed that the inmate needed this specific surgery. Everyone said this was medically necessary. He needs this surgery. It was hip replacement, as I recall. Yes. The issue in De Lauder was this court found that there was a genuine material factual dispute regarding why there was that unjustified delay in giving him the surgery. So one side said it might have been the availability. They just couldn't find someone. The inmate was saying, no, they told me it was cost. They're not going to treat me because of cost. But that's the key there, is that everyone deemed it was medically necessary, and he simply didn't receive it. And the facts. Yeah. So I think there was a fact, and I'm remembering the case now. It's been a few years. The university, there was a fact issue as to whether they were not going to give him the hip replacement just because it cost too much. Yes, Your Honor. Not a medical judgment. We didn't know. We didn't know what the facts were on that, but there was a fact issue on that. Yes, Your Honor. So other than the facts being separate and distinct from the facts here, De Lauder also fails because it came out in late 2018, and the facts of this case were in 2016 to 2018, early 2018. So appellants could not have been put on notice that their actions in refusing Mr. Smith's requested treatment was objectively unreasonable. And again, this is simply assuming that the facts could be, and De Lauder could be analogized to the facts here. I want you to get to all your points, but one thing that I'm interested in is you are representing both length income, which I'm mispronouncing, to shields and tally. Yes, Your Honor. Seems to me they have different, they have very different roles in this, and how qualified immunity might apply to, I mean, do shields and length income have no personal involvement in this? Tally does. So how does the analysis work for the three different defendants? Yes, Your Honor. So that is my second point, is that the district court improperly inferred that defendants, excuse me, appellants to shields and length income were not entitled to qualified immunity simply by stating that tally was not entitled to qualified immunity. And to answer your question, our argument on behalf of Tally, why the decision should be reversed is based on that alleged material factual dispute, right, what we just talked about, whether or not it was categorical. In regards to length income and to shields, the court, the district court had absolutely no evidence other than inferring from Tally's word, we, that they implemented this apparently unconstitutional policy. And so it's important to... We don't service place replace batteries, that's the testimony? That's correct. It's important to note that this is a case brought under 42 U.S.C. section 1983, which mandates personal involvement on behalf of each state actor. And even if a supervisor is not personally involved, a supervisor can be held liable for instituting an unconstitutional policy that results in harm. But as I stated, there is no evidence in the record for either theory, personal involvement or that they instituted, condoned, or otherwise implicitly allowed any type of categorical ban on this surgery. So this was error for two reasons, excuse me, the district court's determination that they were liable is error for two reasons, it improperly inferred that there was a categorical ban and then it improperly inferred that the shields and length income authorized this ban. And from a policy standpoint, the words of one employee cannot simply bind the entire agency based on that statement and that statement alone. Can I ask you just kind of a... There may be no answer to this, but why can't Mr... If he truly needs this, why can't he get it from the VA? Yes, Your Honor. So the record shows that at best in 2011, as I stated earlier, the VA was willing to replace it while he was still in the free world before he became incarcerated. But TDCJ, when they have inmates in their custody, they're required to provide all that medical care. So Mr. Smith had this subjective belief that the VA was willing to go and perform this So, I know the district court opinion in this case is March 30, 21, we're in another year now. Do you... I mean, do you... Is there anything in the record? Maybe not. So forgive me for asking an outside the record question. What's been happening over the last year and change with respect to Mr. Smith? Yes, Your Honor. In March of this year, he actually had the device removed. It was determined that there were... It was malfunctioning as far as wires were poking out, and I believe that was causing him some pain, and they decided to remove the device. I mean, look, I asked you, and it's probably not in the record, I'll ask the other side about that as well. I was just curious. The thing's been... Like, cases like this, they go on forever, and this one is about, you know, ongoing pain treatment, so... Yes, Your Honor, and from my understanding, his pain is well-controlled, and he's still on oral pain medications, and they're still actively treating him. Well, sure, and I'll ask the other side about that as well. Your Honor, just briefly, I just want to go back to the first point about the district court erring in defining clearly established law. I would just state that it's Mr. Smith's burden, as the plaintiff in this case, for a qualified immunity defense, to find a case in his favor that does not define the law at a high level of generality, and he did not do so at the district court, and so the district court improperly didn't even do that on his behalf. The court didn't find one either. Counsel, as I understood your argument, DeLauder, as part of our analysis, you're saying DeLauder really doesn't factor in because of the dates? Did I understand you correctly that it occurs on a timeline, it's afterward, but how do we discard DeLauder if the conduct is ongoing? Well, Your Honor... In other words, doesn't it become relevant once it's rendered and the situation persists? Doesn't DeLauder have some value at that point in this case? Well, Your Honor, I would go back to the fact that I don't think DeLauder is on point. I don't think that that would give the appellants any sort of guidance as to whether their conduct would be violating... Okay, well, I understand your distinction of the case. I'm just talking about in terms of our timeline of events here, we typically have cases where we don't consider later pronouncements of the court when doing the analysis, the second case, the factual scenario, as I understand it, continues and then DeLauder comes down and then... So the circumstance is still in existence. That's my question, is if we were to... Doesn't that allow us to at least look at DeLauder? Because that's what he's going to argue when he gets to the podium. Yes, Your Honor. I mean, I do think it could serve to give guidance when there is an ongoing issue, but I would just say that the last time that the appellants had any sort of personal involvement in this case was significantly before the case even came out. Thank you, counsel. You have time for rebuttal. Now I've misplaced...  Good morning. Good morning, Your Honor. Good morning, Your Honors. May it please the Court. My name is Dan Syed. I am pro bono counsel for Appellee Mr. Robin Wayne-Smith. I'd like to start with the DeLauder question that Your Honors have asked. There are two or three issues that support our contention in advancing DeLauder as clearly established. Now, opposing counsel is correct that DeLauder was released, the opinion was released in November 2018, and there were certain facts that occurred before November 2018. However, Dr. Talley also made an evaluation in 2019 regarding Mr. Smith's condition, so we'd first advance that to show that at that time she was aware of DeLauder. Second, DeLauder did not establish the clearly established law we are advancing. It merely confirmed that, and that's at footnote 7 of the DeLauder opinion, where the Court says we have previously suggested that a nonmedical reason for delay in treatment constitute deliberate indifference, and several of our sister circuits have held so explicitly. The Court then cites the Thibodeau opinion, which is from the Fifth Circuit, along with case law from the Third Circuit and the Fourth Circuit, dating back all the way to 2000. This would be in addition to the robust consensus of persuasive authority we cite in our brief and I'm happy to expound on, but those would be the reasons that DeLauder is applicable still to this case despite its November 2018 release. Fair enough. So let's assume for purposes of this argument that a nonmedical reason for withholding treatment or withdrawing treatment, refusing treatment, you know, ah, it just costs too much, no, we don't feel like doing it, would violate clearly established law under the Eighth Amendment. Let's assume that. Um, on the same, but on the other hand, a disagreement about medical treatment seems pretty well established to me that that's not deliberate indifference. So where is the evidence in this case that the reason for not repairing or replacing the SCS is for a nonmedical reason as opposed to a disagreement about medical treatment? Sure. And we agree with that characterization of the law that medical differences are one bucket and categorical policies, nonmedical reasons are another. Inevitably nonmedical reasons are going to be based on a medical scenario. Here there is Dr. Talley's statement. We don't care, upkeep, remove, replace, we don't change the batteries, but it was not only that. Okay, well, so let's, let's stop there because we see that quoted in the district court opinion. But Dr. Talley goes on to say he'll be treated for his chronic pain the same way all of our patients are treated. So that on its face says, well, we're going to do this treatment. We're not going to do that. Why isn't that a disagreement about medical treatment? Because there are no set of circumstances under Dr. Talley's policy where he would be sentenced, regardless of whether there's a wire protruding out, whether or not Dr. Bayon, Dr. Martin, Dr. Lee said he's eligible, he is, he should be referred to pain management. He should be referred to surgery. He could have this procedure, regardless of the fact that the VA in 2002 implemented the SCS, in 2005 did upkeep on it, 2011 said you're eligible for removal and replacement, regardless of all those facts. And that's exactly what we're saying. An individualized assessment is required. You cannot simply institute a policy because we don't do it. That is a non-medical. Well, so now we're into a different principle, that individualized medical assessment, absent an individualized medical assessment on a particular complaint, there's deliberate indifference, right? That strikes me as a little bit different from a non-medical reason versus a disagreement over medical treatment. Your Honor, I'd argue that a non-individualized assessment is simply a subsection or a category, a part of a non-medical decision. Okay, what case says that? That a... That what you just said. Okay. It's a subset of non-medical reasons. Well, the non-medical decisions that we cite, for example, they cite somewhat different rationale, right? In Colwell v. Bannister, there's a policy where the inmate is not treated because they have one working eye, and so there's a cataract. The court there holds that solely because of the administrative policy, this is deliberate indifference. But if you look at the Seventh Circuit's decision in Hayes, qualified immunity was denied where a doctor stated that, quote, no pain experienced by any prisoner ever warrants prescription pain killer. So they're going to be... That's clearly... So that one, I saw that one. That's clearly not this case because the record reflects, as I understand it, undisputedly that he's receiving pain medication, a whole different array of pain medications. Maybe they're not effective. I have no way of knowing that, but he's receiving pain medication. He's not receiving an intervention with respect to the SCS. But the analogy is that the doctor there said categorically that a certain prescription of... Certain type of treatment, their prescription-strength painkillers will not happen. Here the analogy is that repair, replacement, upkeep of the SCS will not happen. So I understand your point that, you know, the painkiller-to-painkiller analogy may not be the same, but it's the medical treatment, the categorical denial of any sort of adjustment to the SCS, referral to pain management, referral to surgery, that is the analogy. Can you tell me, aside from compensatory damages, which I assume are being sought here against the individual defendants... Yes. What other... What... Mr. Smith is seeking an injunctive relief? Yes, you're right. What precisely is the nature of the injunctive relief that Mr. Smith is seeking? Removal of the SCS device and then replacement of the... Okay.  In a situation like this where it's ongoing, I've got to ask, what is Mr. Smith's current situation with respect to the SCS? Your Honor, again, I don't believe this is anywhere in the record. My understanding, speaking with my client, is consistent with appellate's counsel that the device has been removed, but not... There has no device that has been replaced. Okay. Is he seeking replacement as well as removal? Yes. Okay. Wow. What's the status of the VA with regard to a new device? Does he have any chance at that at this point? I'm not sure, Your Honor, and there's nothing in the record to insinuate that. My understanding is that he and his family are continuing to try to get that relief, which would... That's fair enough. Yeah, no, I understand. I don't know when the record runs out in this case. The district court opinion was 2021. Yeah. Where's the latest part of the record about what pain medications he is receiving? I believe, Your Honor, there is a late 2020 at least with reference to what pain medication he is getting. I believe there is also at some point in 2021 where he is seen, but I don't believe anything in the record after the court's ruling on him. Okay, but that's in the record. What record sites are you looking at? They're probably in there, too, if you have them right there. February 2020, I have ROA 231 and 87475, and then May 2020, Mr. Smith complained of the pain at the location of the SCS. Dr. Martin stated he planned to speak with the regional director regarding what could be done in potential repair upkeep, and that's at ROA 854, 855, and it's cited at the district court opinion at ROA 232. Okay, thank you. And Your Honor has briefly discussed Mr. Smith seeking injunctive relief. As we stated in our briefs, we'd like to make clear that qualified immunity only protects claims against, for damages, so it does not bar claims for injunctive relief. So regardless of the court's opinion with respect to qualified immunity, Mr. Smith's claim for injunctive relief would continue and need to be adjudicated at the district court in the first instance. I see that, and I see, I think in the other side's brief, they concede that based on a case called Cannizzaro, was it? Yes. And look, obviously we accept, the panel's got to accept the precedent. I was a little perplexed by that because qualified, I mean, all these, this lawsuit is against these defendants in their individual capacity. Is that right? Because obviously you can sue people in their official capacity under ex parte young and all that stuff. That's, that's not what's going on here. We've got individual lawsuits. And I thought that qualified immunity pertained not only to damages liability, but also to the burdens of trial. And so, I'm just, I just have to think about that more, I mean, maybe that's what our precedent says. Is, are there, are there a whole line of cases on that point, or is it just the one case? There's the Chrissy F. case, which cites Cannizzaro, so it's, it's not a separate, separate line of precedent. I mean, if there's a qualified, if there, if there's a, an Eighth Amendment violation in prison, you can sue a prison official who's responsible for that in his or her official capacity. Right? And get an injunction. I don't know. I mean, it's, that, that just perplexed me, but, but I, I see that both sides agree, so I must be wrong. As I said, the only other case, Your Honor, that we, we said was the Minton case going back to 1986, but they essentially say the same thing, that, you know, damages are. Could you, I mean, so you're suing not just Talley, who, as I understand it, is the one directly involved in the decision making, but also Linthicum and DeShields, who have no personal involvement. How, how do you get at them in their individual capacity for damages? Mm-hmm. So first and foremost, and I've, you know, kind of touched upon it briefly in the appellant's argument, the procedural posture of this case is essential for the court's assessment. This is an interlocutory appeal from an order denying qualified immunity. So as Your Honor's noted, the appellate review is limited to determining whether factual disputes that the district court identified are material. Mm-hmm. Here, the district court found, and consistent with the, this Court's Tompkins decision, that there was a genuine issue of material, whether it was a triable fact as to whether DeShields and Linthicum promulgated the policy, the categorical policy, that we do not replace, upkeep, remove the device, we do not affix the batteries, we don't refer to pain management, surgery, et cetera. So that's the first portion. That's the evidence on which the ostensible existence of the policy is based? Yes. We don't do SCS. That, yeah. And then, of course, the actual fact that he has never had pain management. Right, right. But if we're going to rely on that evidence, and I know we have to assume that's right for purposes of this appeal, the same evidence says we treat chronic pain the same way all our patients are treated. So I guess, ostensibly, there's also a policy to treat pain with pain medication, right? If it's a categorical policy, it's a non-medical judgment decision that, where? There's also evidence that the district court cites that Dr. Talley says, please manage pain according to DMGs. I don't know what DMGs means. DMGs. What does DMG mean? I don't know what the analogy, or the acronym, means, Your Honor, but my understanding is with the treat, the pain medication that he received, Tylenol, Aspirin, et cetera, and then, as he continued to complain of his pain, adjust accordingly. But there's also a record, portion of the record, Dr. Linthicum denies Mr. Smith's step two grievance, or her office does, which is a fact that, under Tompkins, would allow her to be liable, under supervisory liability. What is the subject of the grievance? So essentially, he writes, Mr. Smith writes, that Dr. Talley will not replace, he cites the actual statement, I can bring this for you, it's at ROA 27, a review of the step one grievance has been completed, it's documented that the Southern Regional Medical Director does not service, replace batteries, or remove, it will still be there when your sentence is over, and then, essentially, it goes on to deny. That's the subject of the grievance, and you're saying Linthicum denied the grievance? That's correct. The step two grievance, Dr. Linthicum's office denied the grievance, which would It won't be there. It won't be there when he gets out, whenever that is, because it's been removed. So whatever the categorical was, since then, it's been removed, right? The TDCJ did not remove it, there's also nowhere in the record that states it's been removed, so the procedural posture is somewhat unique, at least what the court consider it has not, but also, there, ostensibly, if he was able to get, the TDCJ still will not replace it, they will still not put in a new one, and if there was ever a new one put in, it wouldn't be, the same thing would ostensibly happen, he would not be able to have it upkept, he would not be able to replace it, if there were remote issues, we don't know, but the categorical policy and the non-medical judgment decision would still stand, and then with respect to Can I ask a question, and maybe you've already covered this, but is there any reason, given why we don't do this, I understand there's a categorical statement, we don't do this, is there any reason given why we don't do it, is it, anyone ever say why? I do not believe that there's anything in the record insinuating why that is the policy, in our, in Mr. Smith's opinion, making it all the more perplexing, if there was some type of rationale given, we could assess that, but it seems to just be a blanket, don't do it, which is in the face of the fact that he had the VA do it previously, had the VA in 2011 while he was still, before his incarceration, address it, Dr. Aon, Dr. Lee, Dr. Martin, all want to refer him to surgery, or continues to tell him that replacement is plausible, is a viable treatment for you, but the categorical policy continues to get in the way. And we have no, nothing in this record about the reason for the categorical policy? I do not believe so, Your Honor. That's it? Yes. The end. Okay. So, Your Honor, with respect to the jurisdictional issue and our argument that the court does not have jurisdiction, to be clear, that relates to prong one of the qualified immunity analysis, whether or not the court could find as a matter, that there is no deliberate indifference as a matter of law. Here, we have to accept the facts in light most favorable to Mr. Smith, view the evidence and the inferences in his favor, and based on that, the court doesn't have jurisdiction to assess the first prong, of course it can and should, will assess the second prong. You agree, I guess you're saying we have jurisdiction to do prong two, we would have to assume the facts, under those facts, the defendants violated clearly established law? That's correct. Okay. We definitely have cases like that, but we can't get to prong one. And it just came to our attention yesterday, and we'll file a 28-J, but this Court's opinion in Ramirez earlier this month, Judge Duncan, you're off now, had the same issue and we'll file a 28-J so the appellants can respond, but with respect to the clearly established law prong, our position is that if the Court finds that such a categorical policy is not clearly established, it would not only be overruling De Lauder, it would be creating a circuit split with the second, third, fourth, seventh, and ninth circuits based on the cases that we cited in our brief, and they're fairly detailed in how they clearly established law was, so the fourth circuit in Angeloan, the deliberate indifference was the refusal to provide treatment, and this is a quote, based solely on the policy rather than a medical judgment concerning the prisoner's specific circumstances. The third circuit in Lanzaro, the county denies to a class of inmates the type of individualized treatment normally associated with the medical care. Seventh circuit, denying qualified immunity because physicians refused to quote, because of the policy, and those policies are anything from not being able to treat someone because they've had substance abuse within the past two years, not treating someone because they do not have two years remaining or more on their sentence, and really, Judge King, your question about why the policy is there, because, just because it is, really puts this case in the same place as De Lauder, Colwell, Ilya, Wright, and the cases from all the other circuits that we cite, and it is clearly established that that is simply not allowed under the law for Eighth Amendment deliberate indifference purposes. If I agreed with you on that point, the next time someone in the free world gets an implant or some kind of surgery, some kind of treatment, then goes in the prison system, and that person says, okay, I need that now, and the prison system says, well, we don't do that, whatever that is, we do this. No qualified immunity for the official, right? Well, it would need to be judged on the facts of each case. If there was an absolute ban on it, yes, that would be... No, we don't do that, you got that in the free world. We do this. Deliberate indifference. Again, if it was, if the same facts apply, that we do not do this, and that means that regardless of whether it's protruding, regardless of whether someone else said you can get it, regardless of the... You understand, we have to assess what the ripple effects of this decision are going to be. Of course, of course. But at the same time, if a treating physician actually did the assessment and said, no, we don't, you're not getting this because X, Y, Z, medical reasons, an individualized actual assessment, that case would be different, but that's not the case we have here. Yeah, I mean, that's the problem. You don't know exactly what the reason is. You know, we just don't do it. Well, why not, okay? What is the... I mean, best case from the standpoint of opposing counsel, what is the reason? There's no reason given, right? Right. We just don't do it, like floors and windows. We don't do it. That's it, Your Honor, and that would be because you have to take the facts in light most favorable to Mr. Schmidt. That's a critical... Counsel, do you agree that if we were to affirm the district court on the record here today, qualified immunity would be an issue to be presented to the jury using the pattern jury instructions that the jury could assess? They would be charged as to what qualified immunity is and have to make that assessment and have a blank on the jury verdict, or do you see this as an issue that's now water under the bridge when you go back? My understanding, Your Honor, is that the qualified immunity question is a question of law for the court to decide. However, to be clear, this does not mean that Mr. Schmidt wins the case. The case would go back for a trial, and he would have to prove his case before... I mean, if we say that, we go back to our analysis about genuine material issues, those issues are going to be presented to the jury, and there is a Fifth Circuit pattern jury instruction, are you telling me ... I guess what I'm asking is, will that be a defense that you see based on this record to be litigated later, or do you believe that where we are now on this record, that issue has been laid to rest and that he would then have the burden of proving his case as any other tort plaintiff would have? I believe so. The second prong, the clearly established prong, would be decided by Your Honors. The first prong, whether or not a categorical policy actually was instituted, the jury would decide. If there are no further questions. Thank you, Counselor. Thank you. Ms. Coggeshall? Oh, correct. Wow. Okay. That means I'm one out of ten. That's the lawyer's name this week. You look better. Thank you. Judge King says I'm doing better. Okay. Please, the Court. I first want to address one of the pending questions by Judge King about what was the reason for the denial. I think one of the things that the district court's opinion and what kind of got lost in the briefing in this case is the context that Dr. Talley's statements were made. At the record on appeal at 593, before Talley makes the statement about we do not do that kind of surgery or we do not service replace batteries, remove those stimulators, she received a note from Nurse Practitioner Gregory that says, I see no severe pain. He needs nothing special for the pain, but again insists that the stimulator be replaced. Dr. Talley reviewed his medical records before she made the determination about what treatment would be offered to Mr. Smith. Later on in the record, at 582 to 583, from Dr. Talley again, general surgery stated patient didn't have a physiological basis for the pain. Pain specialty is not available. Treat chronic pain at the local level. You're saying there's medical assessments of him at those specific times? Absolutely, Your Honor. Here's what's going on with him. Here's what the treatment needs to be. Absolutely, Your Honor. And I think that comes down to the core of this issue, which truly is a disagreement about medical treatment. So Mr. Smith had a spinal cord stimulator placed in 2002. Almost immediately, that device started acting up in 2003. It was reprogrammed in 2005. There was revision surgery. This is all before he was incarcerated. But this is also the context in which the doctors are looking at his medical record. Even based on Mr. Smith's allegations about this device, the device began to malfunction pretty quickly. And in 2011 is when the VA purportedly wanted to replace the device. We now jump ahead to 2016, where Mr. Smith presents to the medical team complaining about the same loin pain hematuria syndrome. At that time, his device was still functioning some... I am not sure if he got an x-ray in 2016. He did eventually get x-rays when he complained of... I thought there were statements in the record that the x-ray showed this or the x-ray showed that. Maybe a wire was off or something like that. Yeah. So in 2020 was the complaints that Mr. Smith had that there was a wire poking him. At that time, radiology was performed, and it was determined there was a fracture in But back in 2018, 2016 to 2018 period, there was still uncertainty about whether or not the device was functional and whether or not that the device combined with pain medicine was sufficient to treat his pain. The other thing that I think is important to put in context is Mr. Smith's pain, although originated as the loin pain hematuria syndrome, he also had complaints of other types of pain. So at one point, he had an umbilical hernia that was causing him issues. At another point, he complained of back pain. His solution... Does the record reflect what treatment he got for those complaints? Right. It does. So for the hernia, that was, again, pain assessment. They determined that with that, he did not need surgery for the hernia yet, but pain And that would be the standard course of treatment for treating an umbilical hernia. Same thing with the back pain. It wasn't anything that required surgery, but pain medicine was something that was utilized to treat that pain. Was he also given, I don't know, work restrictions, that kind of thing? Correct, Your Honor. He was. And that was also constantly reassessed. Despite these different types of pain that Mr. Smith was experiencing, he still insisted that the only treatment that would solve his problems was the spinal cord replacement surgery. Do you know what DMGs means? Yes. Disease Management Guidelines. Disease Management Guidelines. Yes. Please manage pain according to Disease Management Guidelines is what the responsive tally is. That's a different part of the district court opinion. Yes. And there's no evidence that he wasn't treated. As the record shows, both Dr. Lithicum's motion for summary judgment and Dr. DeShields and Talley's motion for summary judgment each included nearly 500 pages of medical records showing constant evaluation and treatment by medical personnel. The only thing that Mr. Smith did not receive was the specific device that he wanted. The 500 pages is in the record? It is, Your Honor. And with that, we ask that the court reverse the denial of qualified immunity and render judgment on behalf of appellants. Counsel, thank you for a well-argued case. And that concludes our oral argument sitting sadly, and with that, we stand in recess.